The next case is 3-12-0962, People of the State of Illinois, appellate by Laura D'Amico v. Eugene Guenard, appellate by Ricardo Munoz. May it please the Court, my name is Ricardo Munoz, counsel for defendant appellate Eugene Guenard. This appeal was taken from the circuit of Will County, where the defendant appellate was found guilty of two counts of aggravated battery after a bench trial. And on this matter, the standard of review is whether any rational trial or fact could have found the essential elements of the crime beyond a reasonable doubt. In this matter, we are asking that this Court reverse the trial court in its finding of guilty. And in this case, on September 28, 2011, a minor child, three years of age, was presented with a constellation of injuries from head to toe. And an investigation ensued, DCFS was called, and the child, the father, Mr. Guenard were interviewed. And I know the mother was also interviewed, but that evidence did not come out at trial. Furthermore, the father informed the detective and the trial court that the child had numerous injuries before the father brought the minor child to the mother's house. At that time, the father and the mother of the child were separated. They were living separate. And the father brought the minor child, Jacob, to the mother's residence on September 25. At that time, the minor child had injuries to his face, to his thighs, to his hips, to his buttocks area. All that had already existed prior to the child even going over to his mother's house. Further, the only injuries that were, if you will, the new injuries were the child's ears and the groin bruises. And the groin bruises were reported to the father on September 27, 2011, by the mother. And they agreed on the next day that they would go to the emergency room to see what the doctors were going to say about those injuries. Upon arriving at the emergency room, which was at St. Joseph Provenance in Joliet, at that time the child presented with injuries to his ears, his groin, as well as all the other constellation of injuries. The child was treated and released. The father went back to work. Later on that afternoon, the father got the child for his regular visitation and took the child to a different care center, Silver Cross, where the child presented with the same injuries he had in the morning, and then this investigation ensued from there. And furthermore, the child was interviewed at Silver Cross Hospital, was asked whether or not his mother's boyfriend hurt him or somehow caused these injuries. The child said no. Furthermore, the child was also asked who did cause the injuries. He said his brother did. Furthermore, my client, Mr. Gennard, was interviewed by the detective a few weeks later. And at that interview, my client related to the detective that he was staying with his girlfriend on those days of September 25 through the 27th. And he also related to the detective he was using alcohol, using heroin at the time. And he also, Detective Reed, testified that my client informed him that during that time he was wrestling with Jacob and that it was a possibility that he could have kneed Jacob in the groin area. Detective Reed also testified that he was told that they were wrestling roughly on hardwood floor and that there was a possibility that he could have injured his ears. And my client also told the detective that he would never harm a child intentionally. And also, there was no evidence from the trial. In fact, the officer agreed that Mr. Gennard never actually said he hurt the child. And there was a Dr. Leiker who testified at trial who opined that because of the constellation of injuries, she believed to a medical degree of certainty that the child was being abused or somehow those injuries were inflicted intentionally. In this matter, Mr. Gennard was charged with two counts of aggravated battery. Essentially, the first count was about my client striking the minor child in the groin area. The second count was that my client pulled or tugged the ears of the minor child. Throughout the whole trial, not one, not one shred of evidence to count to. There was no evidence that my client pulled or tugged the minor's ears. The most we had was my client's statement saying he might have hurt him or possibly hurt him as wrestling on the ground on a hardwood floor, which was actually Dr. Leiker testified that that wasn't possible. The injuries she saw could not have come from a hardwood floor at that time. So essentially, the state had no evidence regarding injuries to the client's ears caused by my client. On the first charge about the groin area, interestingly enough, my client tells the officer that it's a possibility he could have kneed Jacob. Just like he said before, a possibility he could have hurt him on the hardwood floor. And that's the whole case. Even in Judge Brittany Tomczak's decision, she based on my client's statement to the detective. There's one thing that we don't know. At trial, the detective was asked whether anything was recorded. He was asked whether or not he was writing down word for word as to what he asked and what was said. The answer was no. And the interesting thing here is, well, is it possible the detective could have asked Mr. Gennari, is it possible you could have hurt this child? And he could have said yes. Or he could have said, what happened? And my client could have said, it's possible I hurt the child. The first instance is the officer suggesting an answer. The second one is my client giving it to him. Obviously, the second one would hurt him a whole lot more in court than the first one. The first one is just a suggestion, which isn't really an incriminating statement here. In fact, the statement is wrong because the doctor testifies that it was wrong. And in fact, the doctor never even testified that Jacob being kneed in the groin by an adult male whose area on the leg would be a whole lot bigger could even have accounted for that injury. And it certainly does not account for the constellation of injuries. According to the transcripts, according to Dr. Leiker, she was more concerned about all the other injuries that were on his face, on his torso, on his buttocks, on his hips, on his legs. All through that, she was more concerned about everything else rather than just the ones that the state charged. And again, the interesting thing is most of those injuries were present before the child went to his mother's house, where Mr. Gennard was. And I think that's the major point that was missed here. And we are, in the state's case here, is basically built on a possibility. And a possibility is not proof beyond a reasonable doubt. A rational trier of fact cannot find, should not find guilty on a possibility. Because that's all there is. There is nothing else. And certainly a possibility can be defined as an uncertain thing that may occur. Or put another way, it's possible that a chicken laying an egg in China could positively affect the New York Stock Exchange. It's possible. It's not likely. And that's all this case is. It's possible Mr. Gennard could have done this. That's the best the state can argue here. It's possible. But it's also possible a whole bunch of other people. In fact, the child himself said it wasn't my client. The child himself said it was my brother. And through the evidence at trial, we also found out he doesn't have just one brother. He has two brothers. And the older brother, a 14-year-old teenager who would be of an adult size, which goes to Dr. Leiker's opinion that an adult-sized person could have caused these injuries to the child. And the only thing that the doctor gave us as far as what could have happened, well, the child playing football could have led to some of the bruises, but not all of them. That doesn't preclude anything. In fact, the doctor did not preclude the one explanation that was given about the injury, which was the child fell on a bathtub on the September 27th night, which is what Patrick Morita testified that he was told about how the injury occurred to the groin area. Again, that doesn't explain the ears. However, it's not up to the defendant to explain how the injuries occurred. That is up to the state to prove it affirmatively. And in this case, it is not proven. The state's only thought during closing arguments was, well, the defendant must have lied because sometimes people lie. Well, what's the evidence of the lie? The judge, the court, had no opportunity to observe the defendant's demeanor, his tone of voice, and body language, nothing to help determine whether the defendant's statements were credible or not credible. Furthermore, the only person who did have that opportunity was the detective, who, of course, cannot even make that opinion at trial because that is the position of the trial of fact. And in this case, it seems from the decision itself that the trial court found my client's statements credible because he's saying that, well, he said it was a possibility, so then he must have committed the crime. Again, that gets past the possibility part. Possibility is not beyond a reasonable doubt. Rational trial of fact, in this manner, they should not have found that my client was guilty beyond a reasonable doubt. So with all that being said, we would ask this court to reverse the trial court's finding of guilty. Thank you. Thank you, Mr. Munoz. And Ms. Michael? May it please the court? Counsel? Laura DeMichael on behalf of the people. Nadia Chowdhury actually wrote the brief in this case, but she's on a leave of absence from our office, so it's been assigned to me for argument. Defendant was proven guilty beyond a reasonable doubt. The evidence, when viewed in light most favorable to the people, showed that defendant intentionally inflicted the injuries upon the three-year-old victim to the ears and the groin. The injuries to the ears, penis, and groin were not present before September 25th, and that father's testimony was consistent. Injuries he testified about on cross-examination were to other areas, the hips and the buttocks. Dr. Leiker, the board-certified pediatrician with special training and experience in child abuse, testified that the injuries were intentionally inflicted, the result of physical abuse rather than accidentally inflicted. Those injuries included facial bruising, a scratch on the neck, bruises on the ears. The ears were really red, extending back to the scalp. There was also abdominal bruising and genital bruising. That included multiple areas of bruising to both the base of the penis and the head of the penis and to the lower pelvis and inner thighs. There were circular bruises consistent with the use of fingers or thumbs. Those areas were the belly button, the forehead, and then the inner thigh. Many of these areas were very difficult to bruise and not often injured by accident, so Dr. Leiker opined that they wouldn't have been caused by a football accident or falling in a bathtub or wrestling on a hardwood floor. Instead, she said that the injuries were caused intentionally by an adult-sized person. The adult-sized person who inflicted the abuse was defendant. The victim had been staying with defendant and defendant admitted that he was there over the span of time in which the injuries occurred. And the only explanation he gave for the injuries was that he'd been wrestling with the victim and may have accidentally caused the injuries. But we know this is a false statement because of the testimony of the doctor. The child abuse expert testified that the injuries couldn't have occurred that way. So the statement must have been a false statement intended to exculpate himself by admitting that he had had contact with the child but stating that they were accidentally inflicted by him instead of intentionally, as we know they were. A note about the recording. The statement wasn't recorded because defendant didn't consent to the recording. About the child's statement to the care providers, the child was three years old, and the doctor testified that three-year-olds are sometimes not reliable in the interview process and that the victim really wasn't answering those kinds of questions. And the victim's statement, it's clear that the victim wasn't able to communicate about these events because he said the seven-year-old did it, and the seven-year-old couldn't have caused it. He's not an adult-sized person. And he also said that the mother's boyfriend or anybody else, nobody heard him, and obviously someone did. So the fact that the child made that statement doesn't take away the proof beyond a reasonable doubt. Defendant was proven guilty beyond a reasonable doubt, and so the people would ask that this court affirm his conviction and sentence. Thank you, Ms. Nicholai. Thank you. Mr. Munoz, any response? In this matter, Dr. Leiker, first of all, never testified that the defendant actually caused these injuries. She did testify in depth about several, several pictures, which I believe is the state's theory here that because of the mountain of pictures and the mountain of injuries that somebody had to have caused it, and they put my client on the stand as, if you will, the fall guy. However, no direct evidence that my client actually caused these injuries. In fact, there's evidence the other way, that he actually didn't cause the injuries. Having, as I mentioned before, all of the injuries having been there before the child even got to that house. Certainly the groin occurred the night before. Certainly the ears were not, honestly, they're not even sure how that occurred. And we would suggest to the court that in this matter, my client, or sorry, the state did not prove the case beyond a reasonable doubt. Rational trial fact should not have found my client guilty. Lastly, regarding the interview that was not recorded. The first interview wasn't recorded. The officer apparently interviewed my client and then asked if he wanted to have the interview recorded after that. Well, how about that first one? Didn't give my client the choice in the first one. And honestly, that's the one that matters. That's obviously the one the court is using. That's obviously the one that we all used at trial. And I would suggest to the court that that interview is the one that should have been recorded in some fashion. Because that's what we're arguing about. What questions did the officer ask? What questions did he actually receive? Because the interesting thing is, the both statements that the officer testified to are very similar in how they were given to the officer. Same type of language used would suggest that it's, it just doesn't sound like a person who, if what we were told was true at the trial, is that my client told the officer he was using heroin, was using it the entire time. The statement of, it's a possibility that I could have hit him, or it's a possibility I could have injured him on the floor, just doesn't sound like a statement that a person who is a heroin addict is going to use at that time. And I would suggest to this court that the rational trial fact needed to look at the language used. If the language is possibility, then possibility is not proof beyond a reasonable doubt. Rational trial fact should not have found guilty at this time. And we are asking this court to reverse the trial court's decision. Thank you. Thank you, Mr. Munoz. And thank you both for your argument today. We will take this matter under advisement. Back to you with a written disposition within a short day. And now we'll take a luncheon recess. We'll be back at 1.15.